JAMES A. COLE, Plaintiff in Error, *v.* THE PEOPLE, &c., Defendants in Error.

(GENERAL TERM, FIFTH DISTRICT, OCTOBER, 1869.)

A witness called by the prosecution on the trial of a criminal action, upon a direct examination, gave material testimony against the prisoner, but a cross-examination was rendered impossible by reason of her sudden illness, and incapacity to testify further. — *Held*, the prisoner's counsel objecting, and claiming to have it stricken out, that it was error to submit the testimony so given to the jury.

Where the right to cross-examine is lost without fault, or waiver by the party entitled, the testimony of the witness should be stricken out. Per MULLIN, J.

The case of *Forrest* v. *Kissam* (7 Hill, 463), distinguished, and some of the dicta therein disapproved.

ERROR to the Jefferson County Court of Sessions. The facts are stated in the opinion of the court.

*W. F. Porter*, for the plaintiff in error.

*P. C. Williams*, district attorney, for the defendant in error.

Present—FOSTER, MULLIN and MORGAN, JJ.

By the Court—MULLIN, J.  The prisoner was indicted by a grand jury of Jefferson county, at a Court of Oyer and Terminer, held in and for said county, in June, 1868, for grand larceny. The property charged to have been stolen was a United States bond, of the value of $500, with coupons thereto attached. The prisoner pleaded not guilty. The indictment was remitted to the Court of Sessions of the county, in which court the prisoner was tried upon the indictment, in September, 1869. He was found guilty of the offence, and sentenced to imprisonment in the State prison at Auburn, for the term of five years. The case is brought into this court by writ of error, sued out by the prisoner.

It appeared, on the trial, that one Seth O. Adams owned the bond in question. The prisoner was, at the time of the alleged larceny, engaged in the business of peddling sewing machines, and occasionally stopped at said Adams' house, and sometimes stayed over night. He knew Adams owned the bond, and where it was deposited. On the afternoon of the day of the taking, the prisoner was seen to open the drawer of the desk in which said bond was kept, in the absence of the members of Adams' family. In the evening of the same day Adams went to his barn to milk, leaving

the prisoner in the house with Mrs. Adams, her children, and the hired girl. To prove what occurred after Adams left the house, Adams' wife was called, and testified that the prisoner told her, when alone with her in the house, in the dining room, that she must let him have the bond. She told him she could not; and he said he must have it; she told him to go and ask her husband for it; but the prisoner replied, that he (the husband) would not let him have it if he did, and he must have it; he said he did not want to do anything mean, but if she did not let him have it he would. She further testified, that the prisoner told her if she did not let him have it, he would tell her husband of the improper intimacy theretofore carried on between them; that she then went and got the bond, and laid it on the bureau, and the prisoner took it and carried it away with him. Before leaving, he told her how to leave the drawer in which the bond was kept, to make it appear that the bond was stolen, and she did as he directed, before going to sleep. The prisoner was called on for the bond by Adams, and he denied having it. The prisoner took with him a justice of the peace, in June, 1866, and went to the house of Adams. On arriving there, the prisoner requested the justice to remain outside till he went in, and told him that when he wanted him he would call him. In a short time the justice was called in, and a paper was handed to him signed by Mrs. A., which she was called upon by the prisoner to swear to, and to which after some hesitation, she did swear; and it was taken possession of by the prisoner. When the paper was handed to the justice, it was so folded as to show her signature only; and when inquired of by the justice, whether she understood the contents, the prisoner held the writing before her so that she might read it if she was so disposed.

By the affidavit thus sworn to, she declared that on the day said bond was taken from Adams' house she lent it to the prisoner, and that he was wrongfully accused of stealing it. This affidavit, Mrs. A. testified, was obtained from her by

Cole v. The People.

the assurance of the prisoner that it was the only thing that would save her.

On the close of her direct examination, Mrs. A., who had been under great nervous excitement during the time she was testifying, fainted away. She had convulsions during the night and was wholly incapable of being cross-examined on the next day. Indeed, her condition was such that it was considered dangerous to her life to attempt to examine her further in her physical and mental condition. There being no possibility of further examining her at that time, the prisoner's counsel insisting on his right to cross-examine the witness, requested the court to strike out the evidence of Mrs. A., given on direct examination, to postpone the trial to a future time, or that the prisoner be discharged from arrest on the indictment. All and each of which requests were refused. The court submitted the case on the whole evidence given on the part of the prosecution to the jury, who found the prisoner guilty of the crime charged in the indictment.

Other questions were raised on the trial; but as the refusal to strike out the evidence of Mrs. A. on the direct examination is fatal to the judgment, I have not considered any of them.

The importance and value of a cross-examination is truly and forcibly stated by Mr. Starkie in his work on evidence, vol. 1, page 25. He says: "The power given to a party against whom evidence is offered, of cross-examining the witness upon whose authority the evidence depends, constitutes a strong test both of the ability and willingness of the witness to declare the truth. By this means the opportunity which the witness had of ascertaining the fact to which he testifies, his ability to acquire the requisite knowledge, his powers of memory, his situation with respect to the parties, his motives, are all severally examined and scrutinized." Every person who has been engaged in the trial of causes in courts of justice. indeed every one who has given any attention to the trial of causes, has seen how efficacious a cross-examination is, in eliciting truth, in separating hearsay from knowledge, and in

defeating the most carefully prepared schemes of perjury and fraud. A right so valuable to parties should not be taken away or impaired. On the contrary, it should be held sound and guarded against all attempts, open or covert, to limit or restrict it. Like most other rights of litigants, it may be waived or lost by laches. But to deprive a party of it, the waiver or the laches must be clearly shown. It will not do to refuse a party the right of cross-examination upon doubtful evidence of an intention on his part to waive or surrender it.

The prisoner's counsel not only did not waive his right to cross-examine Mrs. A., but he persistently insisted on his right, or failing in obtaining that, that then his client be discharged, a juror withdrawn, or the evidence given on the direct examination stricken out. The court refused to grant either request, and thus the evidence of Mrs. A. went to the jury in all its force, and unquestionably produced his conviction. Under such circumstances I think the court is bound to presume, that evidence material to the prisoner would have been obtained from the witness had his counsel been afforded the opportunity to cross-examine her. If I am right in this, the court below should have stricken out the evidence of Mrs. A, and instructed the jury to disregard it. In this way, and in this way only, could the rights of the prisoner be protected.

The evidence of Mrs. A. was doubtless retained on the case of *Forest* v. *Kissam*, in the Court of Errors (7 Hill, 463). But that case does not decide any principle that sustains this action of the court in this case. In that case the direct examination of the witness was closed, and then the referee adjourned the hearing till a future day, with the consent of the parties, and without any intimation from the party entitled to cross-examine the witness that he desired so to do. The witness died before the day to which the hearing was adjourned  The court held that the evidence of the witness was competent in the case as the other party had waived his right to cross-examine. The chancellor and senators, Bockes and Jones, seem to have been of opinion that the

Cole *v.* The People.

evidence was competent, and should have been acted upon by the referee in analogy to the practice in the Court of Chancery in similar cases. But all those voting for the reversal of the judgment of the Supreme Court were of the opinion that the party had waived his right to cross-examine, and hence the evidence was competent. It is said by the chancellor and senator Bockes: "That for the death of a witness or other visitation of providence rendering him incompetent to be cross-examined, the party calling him is not responsible. It is one of those calamities that must be borne by the party on whom it falls. And there is therefore no good and sufficient reason for holding the direct examination of such witness incomplete, and excluding it because incomplete." With great respect for the learning and ability of the eminent men who assert the competency of such evidence, I cannot agree with them.

It has been held that the right of cross-examination attaches the instant a witness is sworn, notwithstanding he may not have given a word of evidence. (1 Cowen and Hill Notes, 740.) While the rule may not be as broad as thus stated, yet it is doubtless the law, that if a witness is sworn and gives any evidence on the examination of the party calling him, the right to cross-examine as to anything pertinent to the issue attaches. (1 Greenleaf's Evidence, § 445 and Note 6.) This right cannot under ordinary circumstances be exercised until the direct examination is closed, at which time it becomes absolute; and the party calling the witness cannot by any act of his deprive the other of the right to cross-examine.

If the witness at the close of his direct examination should be taken sick so as to be incapable of examination, the further hearing would be postponed until the cross-examination could be had, and no one would claim that because of temporary illness the right to cross-examine would be lost and the evidence on direct examination admitted. If not, how long shall the hearing be postponed? Why does not such a providential visitation bind the party entitled to cross-examine the witness and deprive him of his right to do so? The answer

Cole *v.* The People.

is because the illness may be temporary merely, and when it has ended the right may be exercised. But suppose it is incurable insanity or deprivation of mind as by paralysis, rendering the witness utterly incapable of giving evidence, shall the court take evidence as to the condition of the witness, and if found incurable, receive the direct examination and ignore the right to cross-examine? Let us suppose again the party calling the witness kills him at the close of his direct examination for the very purpose of preventing his cross-examination, shall the court enter upon that investigation and admit or reject the evidence on direct examination as it shall find him guilty or not guilty of the murder?

In these and other cases which might be supposed, the party entitled to cross-examine is deprived of a most valuable right without fault or laches on his part, and in the case last supposed, by the act of the party calling the witness, while the wrong-doer would, if the evidence is received, be the gainer by his criminal act.

For these and other considerations which will readily occur to any person who examines the question, I am of the opinion that the only safe practice is to strike out the evidence on the direct examination in all cases when the opposite party has lost without his own fault, neglect, or consent, the opportunity for a cross-examination. If either party is to suffer by the death or incapacity of a witness to be cross-examined, it should be the one calling him.

I am therefore of the opinion that the evidence of Mrs. Adams, on direct examination, should have been stricken out, and for submitting to the jury the evidence on direct examination as competent upon the question of the prisoners guilt, in opposition to the objections of his counsel, the judgment of the Court of Sessions should be reversed and a new trial ordered, and record remitted to said court.

Judgment reversed.